IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**OREGON MANUFACTURERS AND COMMERCE,** an Oregon non-profit association, **ASSOCIATED OREGON LOGGERS, INC.,** an Oregon non-profit Association, and **OREGON FOREST & INDUSTRIES COUNCIL,** an Oregon nonprofit association,

Case No. 1:22-cv-00875-CL

Plaintiffs,

v.

**OPINION AND ORDER**

**OREGON OCCUPATIONAL SAFETY AND HEALTH DIVISION**, a division of the Oregon Department of Consumer and Business Services, **RENEE STAPLETON**, in her official capacity as acting administrator for the Oregon Occupational Safety and Health Division, **OREGON DEPARTMENT OF CONSUMER AND BUSINESS SERVICES,** an Agency of the State of Oregon, and **ANDREW STOLFI**, in his official capacity as the Director of the Oregon Department of Consumer and Business Services,

Defendants.

CLARKE, Magistrate Judge

Plaintiffs are non-profit organizations whose members represent the industries of

manufacturing, commerce, logging, and forestry in the State of Oregon. They bring this cause of

action against the defendants, the Oregon Department of Consumer and Business Services

("DCBS"), the Oregon Occupational Safety and Health Division ("OR-OSHA"), which is a division of DCBS, and Renee Stapleton and Andrew Stolfi, who are the directors of those two agencies. Plaintiffs challenge the validity of recent Oregon Administrative Rules ("OAR") 437-002-1081 and 437-003-9791, which seek to provide worker protections from wildfire smoke, and OAR 437-002-0156 and 437-004-1131, which seek to provide workers with heat illness prevention tools.

Full consent to magistrate jurisdiction was entered on December 6, 2022. The case comes before the Court on a motion to dismiss for sovereign immunity and failure to state a claim. An oral argument hearing was held on December 6, 2022. For the reasons below, the motion to dismiss (#20) is GRANTED. This case is dismissed with prejudice, and judgment shall be entered for the defendants.

## BACKGROUND

Defendant OR-OSHA adopted administrative rules to protect Oregon workers from exposure to excessive ambient heat temperatures and hazardous levels of wildfire smoke while at work. *See* OAR 437-002-0156 and 437-004-1131 (the "heat rules"), OAR 437-002-1081[1] and OAR 437-004-9791 (the "smoke rules") (collectively, "the heat and smoke rules"). The heat and smoke rules arise from Executive Order 20-04 ("EO-20-04"), issued on March 10, 2020, in which Governor Kate Brown directed certain state agencies to address and mitigate the impacts of climate change in various ways. Dkt. 1-1 ("Compl., Ex. 1") at 1, 4; Dkt. 1-2 ("Compl., Ex. 2") at 1, 4-5. As relevant here, EO-20-04 directed OR-OSHA to work with the Oregon Health Authority ("OHA") "to jointly develop a proposal for standards to protect employees from

---

[1] Throughout the Complaint, Plaintiffs cite to "OAR 437-002-1080" when referencing the smoke rules. The Court recognizes this as a typographical error. The Court assumes that Plaintiffs meant to type "OAR 437-002-1081," and the Court will address the merits of the substantive arguments without regard to the error.

workplace exposures to excessive heat and wildfire smoke." Compl., Ex. 1 at 1, 4; see also

Compl., Ex. 2 at 1, 4-5.

### a. The Heat Rules

OR-OSHA initiated the rulemaking process for the heat rules in March 2021 in

collaboration with OHA, a rulemaking advisory committee, and stakeholders representing labor

and business interests. Compl., Ex. 1 at 1. In June of 2021, because of the "unprecedented heat

event" at the time, and with the formal rulemaking process underway, OR-OSHA adopted a

temporary version of the heat rules. *Id.* at 1-2. On May 9, 2022, OR-OSHA adopted the final heat

rules, with an effective date of June 15, 2022. Compl. ¶¶ 29-30; Compl., Ex. 1 at 4.[2]  In adopting

the rules, OR-OSHA sought to address the problem that "both employers and workers may not

clearly understand expectations of what must be done to prevent work-related heat illness."

Compl., Ex. 1 at 1. Indeed, "[t]he deadly heat wave of June 2021, which contributed to multiple

workplace hospitalizations and fatalities, underscored the need for such rules to protect workers

against the serious risk of work-related heat illness." *Id.*

The heat rules apply "whenever an employee performs work activities, whether in indoor

or outdoor environments, where the heat index (apparent temperature) equals or exceeds 80

degrees Fahrenheit." Compl. ¶ 33; Compl., Ex. 1 at 8 (OAR 437-002-0156(1)); *id.* at 31 (OAR

437-004-1131(1)). The rules provide limited exemptions for certain workplaces and/or types of

work. Compl., Ex. 1 at 8 (OAR 437-002-0156(1)(a) & (b)); *id.* at 31 (OAR 437-004-1131(1)(a)

& (b)). The heat rules include several provisions that address worker exposure to high ambient

heat temperatures, including drinking water and shade requirements, high-heat practices,

---

[2] OR-OSHA adopted two sets of heat rules: OAR 437-002-0156 and OAR 437-004-1131. Compl. ¶ 31;
*see also e.g.,* Compl., Ex. 1 at 1. As Plaintiffs allege, and the defendants agree, the text of the two sets of
heat rules is "identical in relevant manner for purposes of [Plaintiffs'] complaint." *See* Compl. ¶ 31. OAR
437-002-0156 "applies to general industry," and OAR 437-004-1131 "applies to places of employment
subject to the rules for agriculture." *Id.*

emergency medical plans, acclimatization plans, heat illness prevention plans, supervisor and employee training, and training documentation. *See* Compl., Ex. 1 at 9-12 (OAR 437-002-0156(3)-(10)), 31-34 (OAR 437-004-1131(3)-(10)).

Plaintiffs' due process challenge against the heat rules relates to the provision requiring employers to develop and implement a written "acclimatization plan." Compl. ¶ 37; *see also* Compl., Ex. 1 at 11 (OAR 437-002-0156(7)); *id.* at 33 (OAR 437-004-1131(7)). "[A]cclimatization" is the "temporary adaptation of the body to work in the heat that occurs gradually when a person is exposed to it." Compl., Ex. 1 at 9 (OAR 437-002-0156(2)(a)); *id.* at 31 (OAR 437-004-1131(2)(a)). The relevant portion of the heat rules provides:

> (7) Acclimatization plan. Develop and implement an acclimatization plan and procedures in writing. Employers must choose between two options, either (a) or (b) as described below, and implement the chosen plan.
> (a) Employer-designed acclimatization plan option: Employers who develop their own acclimatization plan must integrate and implement the following factors into their program:
> (A) Acclimated and unacclimated workers;
> (B) The effects of clothing and personal protective equipment on adding to the heat burden of workers;
> (C) The personal and environmental risk factors that put workers at a higher risk of heat-related illness;
> (D) Re-acclimatizing workers as necessary, either due to changes in the weather or a worker spending more than seven days away from the job; and
> (E) The use and maintenance of auxiliary cooling systems such as water-cooled garments, air-cooled garments, cooling vests, and wetted overgarments.
> (b) [National Institute for Occupational Safety and Health ("NIOSH")] acclimatization plan option: Employers that choose not to develop their own acclimatization plan must follow the acclimatization plan developed by the Centers for Disease Control and Prevention and NIOSH; *see* section 4, Appendix A: Mandatory Information for Heat Illness Prevention.

Compl., Ex. 1 at 11 (OAR 437-002-0156(7)); *id.* at 33 (OAR 437-004-1131(7)).

Thus, the acclimatization plan provision of the heat rules provides employers with the option to design their own plan, integrating the factors enumerated in the rules, or adopt a plan drafted by NIOSH. *See* Compl., Ex. 1 at 11 (OAR 437-002-0156(7)); *id.* at 33 (OAR 437-004-1131(7)). A full copy of the NIOSH plan is attached to the Complaint and appended to the heat rules. Compl., Ex. 1 at 18-19, 40-41. The NIOSH plan requires that employers allow employees to acclimatize over a period of 7 to 14 days, with the duration of work in the hot environment gradually increasing during that time period. *Id.* at 18, 40. "For new workers, the schedule should be no more than 20% of the usual duration of the work in the hot environment on day 1 and a no more than 20% increase on each additional day." *Id.* at 18, 40. The NIOSH plan goes on to provide that, "[f]or workers who have had previous experience with the job, the acclimatization regimen should be no more than 50% of the usual duration of work in the hot environment on day 1, 60% on day 2, 80% on day 3 and 100% on day 4." *Id.* at 18, 40.

### b. The Smoke Rules

OR-OSHA began the rulemaking process for the smoke rules in March of 2021 in collaboration with OHA, a rulemaking advisory committee, and stakeholders. Compl, Ex. 2 at 1-2. In August 2021, OR-OSHA adopted a temporary version of the smoke rules "[d]ue to the immediate risk of worker exposure to wildfire smoke during the later portion of Oregon's 2021 wildfire season . . ." *Id.* at 2. On May 10, 2022, OR-OSHA adopted the final smoke rules, with an effective date of July 1, 2022. Compl. ¶¶ 18-19; *see also* Compl., Ex. 2 at 4.[3] OR-OSHA adopted the rules "to address worker exposure to unhealthy and hazardous levels of the primary air contaminant of concern in wildfire smoke, fine particulate matter (PM2.5)." Compl., Ex. 2 at

---

[3] OR-OSHA adopted two sets of smoke rules: OAR 437-004-9791 and OAR 437-002-1081. Compl. ¶ 18; *see also, e.g.,* Compl., Ex. 2 at 1. As Plaintiffs allege, and defendants agree, the two sets of smoke rules are "identical in relevant manner for purposes of [Plaintiffs'] complaint." *See* Compl. ¶ 20. OAR 437-002-1081 applies "to general industry," and OAR 437-004-9791 applies "to places of employment subject to the rules for agriculture." *Id.*

4. In adopting the final smoke rules, OR-OSHA remarked that Oregon's air quality in 2020 was the worst on record, and a report by the Oregon Department of Environmental Quality commented that wildfires are expected to become more frequent. *Id.*

The smoke rules apply when workers "are or will be exposed to wildfire smoke where the ambient air concentration for fine particulate matter (PM2.5) is at or above 35.5 $\mu$g/m3 (Air Quality Index [("AQI")] value of 101 for PM2.5)." Compl. ¶ 22; *see also* Compl., Ex. 2 at 8 (OAR 437-002-1081(1)); *id.* at 17 (OAR 437-004-9791(1)). The rules also define the AQI as an "indicator," developed by the U.S. Environmental Protection Agency ("EPA"), "of overall air quality . . . based on the five criteria pollutants regulated under the Clean Air Act." Compl. ¶ 25; Compl., Ex. 2 at 9 (OAR 437-002-1081 (2)(a)); *id.* at 17 (OAR 437-004-9791(2)(a)). The rules provide limited exemptions for certain workplaces and/or types of work. Compl., Ex. 2 at 8-9 (OAR 437-002-1081 (1)(a)); *id.* at 17 (OAR 437-004-9791(1)(a)). The smoke rules include requirements relating to exposure assessments, training and documentation, two-way communication with employees, and implementation of exposure control (e.g., use of respirators under certain conditions).

As relevant to Plaintiffs' claim that the smoke rules are unconstitutionally vague, the rules require employers to "[m]onitor employee exposure to wildfire smoke when employees are, or are likely to be, exposed to an ambient air concentration for PM2.5 at or above 35.5 $\mu$g/m3 (AQI 101)." Compl., Ex. 2 at 9 (OAR 437-002-1081(3)); *id.* at 18 (OAR 437-004-9791(3)). The monitoring "must be performed at the start of each shift" and as needed to comply with provisions of the smoke rules. Compl., Ex. 2 at 9 (OAR 437-002-1081(3)); *id.* at 18 (OAR 437-004-9791(3)). The rules provide that employers can comply with the requirements to monitor air quality for PM2.5 levels "by using one or more of the following methods":

(a) Check the current average and forecasted AQI value for PM2.5 from the Oregon Department of Environmental Quality, U.S. EPA AirNow or Interagency Wildland Fire Air Quality Response Program websites, or equivalent source;
(b) Check notifications of air quality advisories due to wildfire smoke issued by the Oregon Department of Environmental Quality or local government health agencies;
(c) Directly measure workplace ambient air concentration for PM2.5 in accordance with the testing device manufacturer's user instructions; or
(d) If the employer determines and can demonstrate that none of the methods in subsections (3)(a) through (3)(c) of this standard are available for their work location, the employer can then use the 5-3-1 Visibility Index provided in Appendix B, Table 1 of this standard to estimate the current air concentration for PM2.5, and equivalent AQI value, during daylight hours.

Compl., Ex. 2 at 9 (OAR 437-002-1081(3)); *id.* at 18 (OAR 437-004-9791(3)); *see also* Compl. ¶ 27.

## LEGAL STANDARD

Under Rule 12(b)(1), a defendant may move to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (citation omitted). A defendant may raise the issue of sovereign immunity through a motion to dismiss under Rule 12(b)(1). *See Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017) ("A sovereign immunity defense is 'quasi-jurisdictional' in nature and may be raised in either a Rule 12(b)(1) or 12(b)(6) motion."). When a defendant correctly identifies a jurisdictional defect, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Ninth Circuit law requires that the Court decide the sovereign immunity issues as a threshold question before reaching the merits of the case. *Coal. To Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012).

On a motion to dismiss for failure to state a claim under 12(b)(6), courts presume the truth of allegations in the complaint, and construe them in the light most favorable to the nonmoving party. Fed. R. Civ. P. 12(b)(6); *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987). However, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is plausible on its face only if it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on a motion to dismiss under Rule 12(b)(6), a court may "consider certain materials," including "documents attached to the complaint . . . without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003); *see also Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001), overruled on other grounds by *Galbraith v. Cnty. Of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (same); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) ("If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. . . . These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim.") (citation omitted).

## DISCUSSION

Plaintiff's Complaint is organized into two major claims, one addressing the smoke rules and one addressing the heat rules, with two counts plead under each claim. The first count of each claim alleges that the rules violate the Plaintiffs' federal Due Process rights under the United State Constitution. The second count of each claim alleges that the defendants exceeded their statutory authority under Oregon law by adopting the rules.

The defendants move to dismiss all claims and all counts. They assert that sovereign

immunity bars all the claims against the state agencies, as well as the state law counts against the

individual state officials.  Sovereign immunity does not apply to federal Due Process claims

against individual state officials, but the defendants move to dismiss those as well for failure to

state a claim under FRCP 12(b)(6).  For the reasons below, the defendants' motion is granted,

and all of the claims are dismissed with prejudice.

## I.    All claims asserted against the state agencies, DCBS and OR-OSHA, are barred by sovereign immunity.

Under the doctrine of sovereign immunity, a nonconsenting state and its agencies or

departments are immune from suit in federal court, regardless of the relief sought. *Pennhurst*

*State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Although a state may waive its

sovereign immunity by consenting to suit in federal court, the waiver must "be unequivocally

expressed." *Id.* at 99.

Plaintiffs have sued DCBS, a state agency, and OR-OSHA, a division of that state

agency. Compl. ¶¶ 4 & 6. Oregon has not consented to suit in federal court, and Plaintiffs make

no contrary allegation in the Complaint. *See Delong Corp. v. Or. State Highway Comm'n*, 343

F.2d 911, 912 (9th Cir. 1965) (holding "that Oregon has not consented to be sued in federal court

or otherwise waived its immunity under the Eleventh Amendment"); *Todd v. Oregon*, 2014 WL

1217964, at *4 (D. Or. Mar. 19, 2014) (concluding that the State had not waived sovereign

immunity for federal constitutional claims).

Plaintiffs urge the Court to re-evaluate the generally accepted concept that OR-OSHA, as

a division of a state agency, is a state agency itself.  Plaintiffs contend that "Oregon OSHA

essentially stands in the shoes of Federal OSHA in the State of Oregon," and that "DCBS and

Oregon OSHA, as well as their Administrators, are, in effect, agents of federal OSHA."

Plaintiffs cite to three "facts" to support this assertion:

> (1) This state entity [OR-OSHA] only has jurisdiction and regulatory authority to regulate which is derivative, meaning its jurisdiction and regulatory authority only arises through a delegation of power from a federal law;
> (2) Federal funding makes up a significant portion of Oregon OSHA's budget; and
> (3) This state entity can only act under the supervision of and at the leave of a federal agency, meaning Federal OSHA.

Plf. Resp. 4 (#26). Plaintiffs do not submit evidence or material for the Court to take judicial notice of regarding these purported facts, but they do point to the origins of federal and Oregon OSHA as relevant to the discussion. The Court will review the history of the agency briefly.

The Occupational Safety and Health Act of 1970 requires the Secretary of Labor to promulgate occupational safety or health standards, generally applied to all non-state employers. 29 U.S.C. §§ 652(6), 653, 655(a). The Secretary of Labor is charged with enforcement of those standards by issuing citations or initiating judicial enforcement proceedings. 29 U.S.C. §§ 658, 662. In enacting the Occupational Safety and Health Act of 1970, Congress provided a mechanism for cooperative federalism—it allows state governments to create plans for state enforcement of any occupational safety or health issue with respect to which the Secretary of Labor has promulgated a standard under the 29 U.S.C. § 655. 29 U.S.C. § 667(b). If a state elects to do so, it is required to submit a state plan, setting forth standards and enforcement policies to be approved by the Secretary of Labor for enforcement by the state. *Id*. Among other things, the Secretary of Labor must confirm that the state's proposed standards "are or will be at least as effective in providing safe and healthful employment and places of employment as the standards" promulgated by the Secretary of Labor pursuant to 29 U.S.C. § 655. 29 U.S.C. § 667(c). After the Secretary of Labor approves a state plan and confirms the efficacy of the state's

execution of the plan, the standards promulgated under 29 U.S.C. § 655 are no longer applicable in that state and Secretary of Labor no longer has the authority to commence enforcement actions within that state. 29 U.S.C. § 667(e); 29 C.F.R. § 1902.42(c). In essence, section 667 allows for a form of reverse preemption by the state after the plan is finally approved. *See United States v. Gibson Wine Co.*, 2017 WL 1064658, at *5 (E.D. Cal. Mar. 20, 2017).

Oregon is one of many states who have received the Secretary's approval under the OSH Act for its own state plan. The Oregon State Plan was submitted and initially approved in 1972. 29 C.F.R. § 1952.2(a); 70 Fed. Reg. 24947-01 (May 12, 2005). In 1973, Oregon enacted its own occupational safety and health legislation, the Oregon Safe Employment Act (OSEA). *See* ORS 654.001 et seq. In 1975, the federal government transferred jurisdiction over Oregon's workplace safety laws to OR-OSHA and suspended federal jurisdiction. 70 Fed. Reg. 24947-01 (May 12, 2005); *see also George v. Myers*, 169 Or. App. 472, 482–83 (2000) (citing 29 C.F.R. § 1952.107; 40 Fed. Reg. 18428) ("The state's law—OSEA and its regulations—became the operative worker safety provisions, completely displacing [federal] OSHA.").

The Oregon State Plan received its final approval on May 12, 2005. 29 C.F.R. § 1952.2; 70 Fed. Reg. 24947-01 (May 12, 2005). As the result of the approval, "Federal OSHA's standards and enforcement authority no longer apply and Federal concurrent jurisdiction is relinquished with respect to occupational safety and health issues covered by the Oregon plan." 70 Fed. Reg. 24947-01 (May 12, 2005).[4]

While the Oregon State Plan and standards must comply with certain minimum federal standards in order to maintain its approval, Oregon is free to regulate in areas where there is no

---

[4] Since OSEA's enactment, the Oregon Legislature has added to and modified the statute several times. *See* ORS 654.001 *et seq.* (noting amendments). And as Plaintiffs' brief notes, OR-OSHA derives the vast majority of its funding from the Oregon Legislature, not the federal government. Plf. Resp. at 6 (acknowledging that less than 25 percent of OR-OSHA's annual funding comes from the federal government).

federal counterpart. 29 U.S.C. § 667(a). In this case, OR-OSHA promulgated the heat and smoke

rules at issue pursuant to an executive order from Oregon's Governor Kate Brown, not as the

result of any federal directive. *See* Compl., Ex. 1 at 1, 4 (ECF No. 1-1); Compl., Ex. 2 at 1, 4-5

(ECF No. 1-2). Moreover, even where there is a federal counterpart, Oregon is free to

promulgate different and more stringent standards than federal standards on the same issue, and

indeed, has done so numerous times. 29 U.S.C. § 667(c)(2).

     Based on all of the above, the Court can find no reason to adopt the Plaintiff's contention

that OR-OSHA, a state agency, should be considered to be "acting in the shoes" of the federal

government.  Or, even if it were, the Court can see no reason why such cooperative federalism

should result in the state agency losing its sovereign immunity, and the Plaintiffs have admitted

they have no law or case law to rely on for this proposition.

     Conversely, other courts have found that organizations in similar circumstances have

been specifically found not to be a "federal instrumentality." *See Kuntz v. Lamar Corp*, 385 F.3d

1177, 1184 (9th Cir. 2004) (finding that a cooperative was not a federal instrumentality because

the Federal Government did not exercise control over the detailed physical performance and day

to day operations of the entity, and holding that neither federal regulation, nor federal funding…

is sufficient to make an entity a federal agency). *See also Atascadero State Hosp. v. Scanlon,* 473

U.S. 234, 247 (1985) 473 U.S. at 246-47 (the "mere receipt of federal funds" and participation in

"programs funded under [a federal] statute" by a state "falls far short of manifesting a clear intent

to condition participation in the programs funded under the Act on a State's consent to waive its

constitutional immunity"); *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (the "mere fact that a

State participates in a program through which the Federal Government provides assistance for

the operation by the State of a system of public aid is not sufficient to establish consent on the

part of the State to be sued in the federal courts"); *Sossamon*, 563 U.S. at 293 ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."). Moreover, even if it could be said that OR-OSHA stands in the shoes of federal OSHA, Plaintiffs do not address whether federal sovereign immunity would apply to these allegedly "federal" agents and agencies.

For all of the reasons above, the Court finds that OR-OSHA is a state agency, and the State of Oregon has not formally waived sovereign immunity for the DCBS or OR-OSHA. Therefore, these entities are immune to suit in federal court. The Ninth Circuit has concluded that Eleventh Amendment immunity is a "threshold issue" and a court "may not bypass the issue in favor of deciding the case on the merits." *Cardenas v. Anzai*, 311 F.3d 929, 934 n. 2 (9th Cir. 2002*); see also Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 144–45 (1993) (citation omitted) (Eleventh Amendment immunity is immunity from suit rather than a mere defense to liability). Therefore, Plaintiff's claims against DCBS and OR-OSHA are dismissed with prejudice.

## II.    The state law claims against the individual defendants are barred by sovereign immunity.

Plaintiffs assert claims against Defendant Stapleton in her official capacity as the Acting Administrator of OR-OSHA and against Defendant Stolfi in his official capacity as Director of DCBS. Plaintiffs seek injunctive relief barring Defendants Stapleton and Stolfi from enforcing the Oregon Administrative Rules at issue. Compl. ¶ 78.

Sovereign immunity extends to state officers who act on behalf of the state. *NRDC v. Calif. Dept. of Transp.*, 96 F.3d 420, 422 (9th Cir. 1996). Sovereign immunity and the Eleventh Amendment bar suits against state officials when the state is the real party in interest. Pennhurst

465 U.S. at 101-02. "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* at 101 (*quoting Hawaii v. Gordon*, 373 U.S. 57, 58 (1963)). Suits against state officials are suits against the state where the relief sought would "interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting. . . ." *Id.* at 101 n. 11 (*quoting Dugan v. Rank,* 372 U.S. 609, 620 (1963) (internal citations omitted)).

 *Ex parte Young*, 209 U.S. 123 (1908), provides a limited exception to the general rule barring official capacity suits against state officials: "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102. Under this exception, a state official may be sued in federal court in her official capacity if the relief sought is "prospective injunctive relief to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). This exception is premised on the proposition that federal court authority to enjoin a "continuing violation of federal law [is] necessary to vindicate the federal interest in assuring the supremacy of that law." *Id.* However, the *Ex parte Young* exception is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst*, 465 U.S. at 106; *see also Hale v. Arizona*, 967 F.2d 1356, 1369 (9th Cir. 1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993) ("the Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law"). This is because "[a] federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law." *Pennhurst*, 465 U.S. at 106. As the Supreme Court acknowledged in *Pennhurst*, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* The Court further held

that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh
Amendment." *Id.* at 121; *see also Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133-
34 (9th Cir. 2006) (holding that "28 U.S.C. § 1367 does not abrogate state sovereign immunity
for supplemental state law claims").

Here, Plaintiff's state law claims (Count 2 of the First and Second Claims for Relief),
against Defendant Stapleton and Defendant Stolfi, assert that enactment of the heat and smoke
rules exceeded the authority granted by Oregon state statute. Compl. ¶¶ 46 & 65 (alleging that
OR-OSHA "derives its authority to adopt regulations from the Oregon Safe Employment Act
('OSEA') set forth in ORS Chapter 654 et seq."); ¶¶ 50 & 69 (alleging that OSEA does not
provide authority to regulate "general societal hazards"). These are Oregon state law claims
brought against State officials acting in their official capacity, which are in fact claims against
the State and State agencies. Therefore, these claims are barred by sovereign immunity, and no
*Ex Parte Young* exception applies. These claims are dismissed with prejudice.

### III.    The federal Due Process claims against the individual defendants are dismissed for failure to state a claim because Plaintiff has not and cannot allege that the rules are vague in all circumstances.

The federal Due Process claims against the individual defendants are not barred by
sovereign immunity, but they are nevertheless dismissed for failure to state a claim because
Plaintiff cannot allege that the rules are vague in all circumstances.

Count One of Plaintiffs' First Claim asserts a violation of Constitutional Due Process. It
claims that the smoke rules "fail to provide employers... with a means to determine if wildfire
smoke particulates are contained within the PM2.5 contaminates at a particular work site, thus
making the rules applicable to that work site." Compl. 40. This claim also asserts that the smoke
rules provide inconsistent requirements as to metrics for measuring the PM2.5 levels and that the

metrics will be predictably imprecise for a particular worksite, rendering the rules subject to

arbitrary and capricious enforcement. Compl. 41-42. Plaintiffs claim that the smoke rules "are

so vague that they do not provide employers... with fair notice of what conduct is required or

proscribed;" thus the smoke rules are violative of due process.

Count One of Plaintiffs' Second Claim also asserts a violation of Constitutional Due

Process. It claims that the heat rules "fail to provide employers with a means to determine when

the acclimatization plan is required to be triggered on a particular work site, how long such plans

must be implemented if the weather changes, or what time of employer-specific plan would be

considered not in compliance." Compl. 59. As with the smoke rules, Plaintiffs assert that the heat

rules are so vague that they do not provide employers with fair notice of what conduct is required

or proscribed; thus, they are violative of due process. Compl. 62. Because Plaintiff has not, and

cannot, allege that the smoke rules or the heat rules are vague in all circumstances, both of these

claims are dismissed with prejudice.

The United States Supreme Court has long held that vague laws are not permissible:

> Vague laws offend several important values. First, because we
> assume that man is free to steer between lawful and unlawful
> conduct, we insist that laws give the person of ordinary
> intelligence a reasonable opportunity to know what is prohibited,
> so that he may act accordingly. Vague laws may trap the innocent
> by not providing fair warning. Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). However, "the degree of vagueness

that the Constitution tolerates—as well as the relative importance of fair notice and fair

enforcement –depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside,

Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Business regulations, particularly those that

involve only civil penalties (such as those here), are subject to a less strict vagueness test. *Id.*; *see*

*also* OAR 437-001-0135 through OAR 437-001-0203 (rules detailing OR-OSHA's civil

penalties). This is so in part because a business enterprise has "the ability to clarify the meaning

of the regulation by its own inquiry, or by resort to an administrative process," *Vill. of Hoffman

Estates*, 455 U.S. at 498.

To defeat a facial vagueness challenge, the rule at issue is only required to "give the

person of ordinary intelligence a reasonable opportunity to know what is prohibited. . .." *Id.*

(quoting *Grayned*, 408 U.S. at 108-09). Moreover, if the rule implicates no constitutionally

protected conduct, a facial vagueness challenge should be upheld "only if the enactment is

impermissibly vague in all of its applications." *Vill. of Hoffman Estates*, 455 U.S. at 498

Citing *Johnson v. United States*, Plaintiff urges this Court to find that this standard has

been overturned by more recent Supreme Court case law. However, while *Johnson* did indeed

reject the principle that a challenged statute must be vague in all circumstances, that case very

clearly applied to criminal law circumstances, as indicated by the Court's language in describing

the vagueness standard it was applying:

> The Fifth Amendment provides that "[n]o person shall ... be
> deprived of life, liberty, or property, without due process of law."
> Our cases establish that the Government violates this guarantee by
> taking away someone's life, liberty, or property under a **criminal
> law** so vague that it fails to give ordinary people fair notice of the
> conduct it punishes, or so standardless that it invites arbitrary
> enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358, 103
> S.Ct. 1855, 75 L.Ed.2d 903 (1983). The prohibition of vagueness
> **in criminal statutes** "is a well-recognized requirement, consonant
> alike with ordinary notions of fair play and the settled rules of
> law," and a statute that flouts it "violates the first essential of due
> process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46
> S.Ct. 126, 70 L.Ed. 322 (1926). **These principles apply not only
> to statutes defining elements of crimes, but also to statutes
> fixing sentences.** *United States v. Batchelder*, 442 U.S. 114, 123,
> 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

*Johnson*, 576 U.S. 59, 595-95 (emphasis added).

Plaintiffs also point to *Guerrero v. Whitaker*, contending that in that case the Ninth Circuit recognized *Johnson's* reversal of the "vague in all circumstances" standard. But *Guerrero*, along with *Dimaya*, applied *Johnson* to immigration removal statutes, which are at least quasi-criminal in nature. *See Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018); *Sessions v. Dimaya*, 200 L. Ed. 2d 549, 138 S. Ct. 1204, 1209 (2018). The Supreme Court has held that removal and deportation is "a particularly severe penalty," potentially "of greater concern to a convicted alien than any potential jail sentence." *Dimaya*, 138 S. Ct. at 1213 (internal quotation marks and citations omitted). Finally, the Ninth Circuit has continued to apply the "vague in all circumstances standard" post-*Johnson*. *See Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*, 971 F.3d 1021, 1030 (9th Cir. 2020) ("If a law 'implicates no constitutionally protected conduct,' a facial vagueness challenge under the Due Process Clause of the Fourteenth Amendment can succeed only if the law 'is impermissibly vague in all of its applications...'").

Here, the smoke and heat rules do not implicate constitutionally protected conduct. They create metrics by which a business or employer must evaluate whether the ambient heat or smoke in the air creates an unsafe working environment for employees – a heat index of 80 degrees Fahrenheit or above, and a high PM2.5, as indicated by an AQI value of 101 or above – and then the employer must mitigate the dangers of that working environment by providing breaks, heat acclimation over time, and other protections. The rules thus implicate economic and business conduct, which is not constitutionally protected.

Next, the heat and smoke rules contain no penalty provisions; however, criminal penalties may be available under ORS 654.991(1) in extremely limited circumstances where a willful violation results in a fatality. ORS 654.991(1) ("any employer who willfully violates [certain

OR-OSHA regulations], and that violation is found to have caused or materially contributed to the death of any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both."). A violation is "willful if it is committed knowingly by an employer or supervisory employee who, having a free will or choice, intentionally or knowingly disobeys or recklessly disregards the requirements of a regulation, rule, standard or order." ORS 654.991(1). Similarly, OAR 437-001-0165 and OAR 437-001-0175, the only two OR-OSHA regulations that allow for penalties up to $135,653, require violations to be willful or repeated. See OAR 437- 001-0165 (addressing "repeat violation"); OAR 437-001-0175 (addressing "willful or egregious" violation). Therefore, while the OR-OSHA penalties can include criminal and high monetary penalties, these only apply in very limited circumstances. The heat and smoke rules regulate economic activity and are not criminal or quasi-criminal in nature. Therefore, in order to state a facial vagueness challenge, Plaintiffs must allege that the smoke and heat rules are vague in all circumstances.

Plaintiffs do not allege that the heat and smoke rules are vague in all circumstances. Nor could this be feasibly alleged. While there may be days and times when the smoke in the air is less detectable to the average person's senses, the smoke rules give a variety of ways in which the employer may reasonably determine whether the PM2.5 is high enough to enact the protections. Similarly, while there may be challenges in rolling out the acclimatization protocols day by day, as temperatures rise and drop, Plaintiffs can clearly determine whether the ambient heat is over 80 degrees Fahrenheit. Employers are given a specific acclimatization protocol they can enact which will satisfy the rules, and they are also given the flexibility to enact their own protocol within certain parameters. The fact that there are alternative methods of measuring and determining whether the rules' thresholds for protections have been met do not make the rules

inconsistent or vague in all circumstances. Because curing the deficiencies of these claims is not feasible – the Court has already determined that it cannot be plausibly alleged that the smoke and heat rules are vague in all circumstances – the two remaining state law claims are dismissed with prejudice.

## ORDER

For all of these reasons, the Defendants' motion to dismiss (#20) is GRANTED. Judgment shall be entered on behalf of the Defendants.

It is so ORDERED and DATED this _____ day of December, 2022.

MARK D. CLARKE
United States Magistrate Judge